# COMPOSITE

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**ABALITH HOLDINGS LIMITED,**                  Case No.:

                          Petitioner,

    vs.

**JOSTEIN EIKELAND,**

                          Respondent.

### DECLARATION OF DANIEL TUNIK IN SUPPORT OF PETITION FOR CONFIRMATION, RECOGNITION, AND ENFORCEMENT OF FOREIGN ARBITRAL AWARD

Daniel Tunik, an attorney duly admitted to practice in Switzerland, declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746(1):

1. I am an attorney in Switzerland and a member of the law firm Lenz & Staehelin, attorneys for Petitioner Abalith Holdings Limited ("Abalith") in Switzerland. The facts stated in this declaration are known to me personally or are based on information provided in the annexed exhibits.

2. I submit this declaration in support of Abalith's Petition to confirm, recognize, and enforce the foreign arbitration award entered in Abalith's favor on April 8, 2019 (the "Award"), against Respondent Jostein Eikeland ("Eikeland", together with Abalith, the "Parties"). A true and accurate copy of the Award is annexed hereto as Exhibit A. The original copy of the signed Award is on file in Geneva, Switzerland office of my firm, and is available for the Court's inspection upon request.

3. The underlying dispute between the Parties arises out of a December 5, 2016, Reorganisation (sic) Agreement between Eikeland, Abalith, and a company called Gingerpath

1

Limitted, and regarding the reorganization of the shareholding and financing of a company called

Alevo Group SA (the "Agreement").

4.  In particular, the Article 17 of the Agreement contains an arbitration provision requiring:

> Any dispute, controversy or claim arising out of or in relation to this Agreement, including the validity, invalidity, breach or termination thereof, shall be settled by arbitration in accordance with the Swiss Rules of International Arbitration of the Swiss Chambers of Commerce in force on the date when the Notice of Arbitration is submitted in accordance with these Rules. The number of arbitrators shall be one. The seat of the arbitration shall be in Geneva. The arbitral proceedings shall be conducted in English.

5.  A true and accurate copy of the Agreement is attached hereto as Exhibit B.

6.  On March 15, 2018, after Eikeland's failure to pay certain amounts under the Agreement,

Abalith initiated an arbitration pursuant to the Agreement with the Swiss Chambers' Arbitration

Institute in Geneva (the "Arbitration").

7.  Following numerous submissions, the sole arbitrator found in favor of Abalith, ruling that

Eikeland was required to pay Abalith:

a.  $7,579,109.50 with interest at a rate of 5% per year as of January 23, 2018;

b.  CHF 49,803.00;

c.  CHF 14,773.34; and

d.  CHF 39,090.00.

8.  The Award therefore provides for a total award to be paid by Eikeland to Abalith of

$7,579,109.50 plus CHF 103,666.34.

9.  As of the filing of this declaration, I am not aware of any payments that Eikeland has made

on the Award to Abalith.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

2

Executed this 19ᵗʰ day of April, 2021 in Geneva, Switzerland.

_____
Daniel Tunik

3

PLTS_Ex. "A" -- 03

# Exhibit A

RECU LE  0 9 AVR. 2019

SWISS CHAMBERS' ARBITRATION INSTITUTION

Swiss Chambers' Arbitration Case no 300436-2018

# Final Award

of 8 April 2019

in the matter between

**ABALITH HOLDINGS LIMITED,** Makaiou III, Av. Neocleous House 195, 3030 Limassol, Cyprus

**(Claimant)**

represented by Mr Daniel Tunik and Mr Andreas Rötheli, Lenz & Staehelin, route de Chêne 30, 1211 Geneva 6, Switzerland

and

**Mr JOSTEIN EIKELAND**, 787 Marble Way, 33532 Boca Raton, Florida, United States of America

**(Respondent)**

represented by Mr Michael Bösch and Mr Raphael Meier, Thouvenin Rechtsanwälte KLG, Klausstrasse 33, 8024 Zurich, Switzerland

before the Sole Arbitrator

Dr. Luc Pittet

Attorney at law, Lausanne, Switzerland

1

PLTS_Ex. "A" -- 05

# A. FACTUAL BACKGROUND

## I.   The Parties

**The Claimant,** Abalith Holdings Limited (hereinafter also referred as *"the Claimant"* or *"Abalith"*) is a company incorporated in Cyprus, with its registered office at Makaiou III, 195 Neocleous House, 3030 Limassol.

**The Respondent**, Mr Jostein Eikeland (hereinafter also referred as *"the Respondent"* or *"Mr Eikeland"*) is a Norwegian citizen resident at 787 Marble Way, 33532 Boca Raton, Florida, in the United States of America.

## II.   The Relevant Facts of the Case

**1.-**   The Claimant and the Respondent were bound by a shareholders' agreement organizing their relationship as shareholders of the Company Gingerpath Ltd, organized under the laws of Cyprus. This shareholders' agreement, dated 19 February 2016, was linked to the investment and to the shareholding in the Company Alevo Group SA, a corporation organized under the laws of Switzerland and registered in Martigny, Switzerland.

**2.-**   On 5 December 2016, the Claimant, the Respondent and Gingerpath Ltd signed a document entitled *"Reorganisation Agreement* (sic)*"* (hereinafter also referred as *"The RA"*). The purpose of this RA was to refinance the Company Alevo Group SA and to ensure its survival for the next years. To that effect, the shareholders' agreement dated 19 February 2016 was terminated and shares of Gingerpath Ltd and of Alevo Group SA were transferred.

**3.-**   As part of the RA, Abalith agreed to grant Mr Eikeland a loan in the total amount of USD 10.000.000,- (ten millions US Dollars), to be reimbursed in full by 1st July 2018 (hereinafter also referred as *"The Loan"*).

**4.-**   The Loan is subject of Art. 5 of the RA, which reads as follows, in pertinent parts ;:

2

" *5*   *PERSONAL LOAN GRANTED TO JE*

   *A.*   *TERMS AND CONDITIONS OF LOAN*

5.1   *Abalith hereby grants to JE a Loan in the total amount of USD 10.000.000 (ten million US dollars) to be reimbursed in full by July 1st, 2018 (the "Loan").*

5.2   *The Loan shall carry interest of 3.5% per annum, accrued and payable quarterly, starting from April 1st, 2017.*

5.3   *The Loan shall be disbursed by Abalith to JE in three tranches by wire transfer to a bank account, as indicated in advance by JE to Abalith, in immediately available funds.*

   5.3.1   *a first tranche of USD 5.000.000 (five million US dollars) shall be disbursed to JE a soon as the conditions of Section 5.4 shall have been met ;*

   5.3.2   *a second tranche of USD 2.500.000 (two million five hundred thousand US dollars) shall be disbursed to JE on March 1st 2017 at the earliest but no later than March 31st 2017 ; and*

   5.3.3   *a third tranche of USD 2.500.000 (two million five hundred thousand US dollars) shall be disbursed to JE on June 1st, 2017, at the earliest and no later than July 31st, 2017, on condition that Milestone 1 has been achieved by that date.*

5.4   *The first tranche of the Loan shall be granted on the condition that :*

   5.4.1   *the Shareholders' Agreement will have been validly terminated, in accordance with Section 1 above ;*

   5.4.2   *all 4.366.666 Gingerpath Shares held by JE will have been validly transferred to Abalith and Abalith has been validly registered in the share register of Gingerpath as the sole shareholder of Gingerpath, in accordance with Section 2 above ;*

   5.4.3   *all 3.219.206 Alevo Shares will have been validly transferred to Abalith and JE will not have voted (through his voting rights in Alevo held directly or indirectly) in a way to prevent such transfer ;*

3

> 5.4.4    the board of directors of Alevo will have appointed a new CEO in accordance with Section 6 below.".

**5.-**    Art. 4 of the RA, entitled *"Funding of Alevo"* provides among others for a milestone plan to raise investment in Alevo Group SA. According to this milestone plan, Mr Eikeland had to raise investment in Alevo Group SA in the amount of at least CHF 100.000.000 (one hundred million Swiss Francs) until 15 September 2017. Art. 4.2 of the RA provides the milestone plan for the 2017 funding and reads as follows :

> " *4.2    The 2017 Funding (as further defined in Section 4.3 below) shall be achieved according to the following milestone plan :*
>
> 4.2.1    *a first CHF 25.000.000 (twenty-five millions Swiss Francs) shall have been raised by JE by March 31, 2017 ("**Milestone 1**") ;*
>
> 4.2.2    *a further CHF 25.000.000 (twenty-five millions Swiss Francs) shall have been raised by JE by June 30, 2017 ("**Milestone 2**") ;*
>
> 4.2.3    *a final CHF 50.000.000 (fifty millions Swiss Francs) shall have been raised by JE by September 15, 2017 ("**Milestone 3**", together with Milestone 1, and Milestone 2, the "**Milestones**" and each a "**Milestone**").*

**6.-**    Art. 16 of the RA, entitled *"Governing Law"*, provides that *"This Agreement is subject to, shall be construed in accordance with and governed by the laws of Switzerland"*.

**7.-**    It is undisputed between the Parties that in execution of Art. 5.3.1 and 5.3.2 of the RA, the Claimant transferred to the Respondent a total amount of USD 7.500.000.00, in three tranches paid on 6 December 2016, 27 December 2016 and 15 March 2017.

**8.-**    As Milestone 1 provided by Art. 4.2.1 of the RA was never achieved, the Claimant never disbursed the last tranche of the Loan.

**9.-**    By letter dated 14 August 2017, the Claimant claimed from the Respondent for the payment of an amount of USD 119.767.12, as interests due until 30 June 2017, in accordance with Art. 5.2 of the RA. The Claimant set a deadline for the payment of this amount on 31 August 2017. In this letter, the Claimant indicated to the Respondent that in case he should fail to make the payment of the interests by the deadline, it would have *"no other choice than to cancel the Loan and claim full repayment thereof with any other available options, including any legal proceedings"*.

PLTS_Ex. "A" -- 08

**10.-** On 31 August 2017, the Respondent paid to the Claimant an amount of USD 119.767.12.

**11.-** By letter dated 3 October 2017, the Claimant claimed from the Respondent for the payment of an amount of USD 66.164.00, as interests due for the third quarter of 2017, in accordance with Art. 5.2 of the RA. The Claimant set a deadline for the payment of this amount on 10 October 2017 informing the Respondent that failing payment within this deadline, it would *"terminate the Loan with immediate effect, in accordance with Art. 107 para. 2 and Art. 109 of the Swiss Code of Obligations, and request that you immediately reimburse the principal amount of the Loan, as well as the accrued interests".*

**12.-** On 10 October 2017, the Respondent paid to the Claimant an amount of USD 66.161.38.

**13.-** By letter dated 9 January 2018, the Claimant claimed from the Respondent for the payment of an amount of USD 66.167.38, as interests due for the last quarter of 2017 in accordance with Art. 5.2 of the RA. The Claimant set a deadline for the payment of this amount on 16 January 2018, informing the Respondent that failing payment within this deadline, it would *"terminate the Loan with immediate effect, in accordance with Art. 107 para. 2 and 109 of the Swiss Code of Obligations, and request that you immediately reimburse the principal amount of the Loan, as well as the accrued interests".*

**14.-** By e-mail dated 15 January 2018, in response to an e-mail of the Claimant dated 9 January 2018, the Respondent confirmed *"that I have received the notice"* and added that *"I'll revert this week with Payment confirmation or schedule of payment".*

**15.-** No payment was received within the deadline set on 16 January 2018.

**16.-** By letter dated 18 January 2018 sent to the Respondent by e-mail and by registered mail, the Claimant declared the termination of the Loan with immediate effect, in accordance with Art. 107 para. 2 and 109 of the Swiss Code of Obligations. As a result of this termination, the Claimant requested the immediate payment of an aggregate amount of USD 7.579.112.88, namely USD 7.500.000.00 for the principal amount of the Loan and USD 79.112.88 as accrued interests. The Claimant set a deadline on 22 January 2018 to receive the payment of the above mentioned amount of USD 7.579.112.88, claiming that it would request for default interests, at the statutory rate of 5%, in case the payment of this amount would not be received within this deadline.

5

PLTS_Ex. "A" -- 09

**17.-** In an e-mail dated 23 January 2018, the Respondent referred to the letters of the Claimant dated 18 January 2018 and 9 January 2018, and challenged the validity of the termination of the Loan, submitting that in the context of the RA, a minor delay in the payment of the interests would not entitle the Claimant to terminate the Loan with immediate effect. The Respondent furthermore offered to pay the requested amount in several instalments, on 16 February 2018, 15 July 2018, 15 September 2018 and 15 November 2018.

**18.-** By letter dated 26 January 2018, the Claimant informed the Respondent that it could not accept this settlement proposal for a repayment of the Loan in several instalments.

## III.   The Arbitration Proceedings

**19.-** On 15 March 2018, the Claimant initiated arbitration proceedings, filing a Notice of Arbitration before the Swiss Chambers' Arbitration Institution in Geneva. In its Notice of Arbitration, the Claimant submitted the following requests and prayers for relief :

*"Abalith Holdings Limited respectfully requests the arbitral tribunal to make an award :*

*(i)      ordering Mr Jostein Eikeland to pay Abalith Holdings Limited the sum of USD 7.579.112.88, plus interests at 5% per annum from 18 January 2018 ;*

*(ii)     ordering Mr Jostein Eikeland to pay all costs of this arbitration proceedings on a full indemnity basis, including all legal and other costs incurred by Abalith Holdings Limited, plus interests at 5% per annum from the date of the Final Award ; and*

*(iii)    awarding such other relief as might be necessary"*

**20.-** By letter dated 16 March 2018, the Secretariat of the Arbitration Court of the Swiss Chambers' Arbitration Institution acknowledged receipt of the Notice of Arbitration and exhibits filed by the Claimant, as well as the payment of the non-refundable registration fee, received on 2 March 2018. The Secretariat of the Arbitration Court registered the matter under reference case No. 300436-2018 and invited the Respondent to file its Answer to the Notice of Arbitration within thirty days from receipt of the above mentioned letter. Moreover, the parties were invited to jointly designate the Sole Arbitrator within thirty days from the

receipt of the above mentioned letter, pursuant to Art. 7 (i) of the Swiss Rules of International Arbitration (hereinafter : the *"Swiss Rules"*), mentioning that failing to jointly designate the Sole Arbitrator within the granted timeline, the Court shall proceed with the appointment in accordance with Art. 7 (iii) of the Swiss Rules.

**21.-** On 23 April 2018, the Respondent filed his Answer to the Notice of Arbitration. In his Answer, the Respondent submitted the following requests and prayers for relief :

*"Respondent respectfully requests that :*

*1. Claimant's claim be dismissed ;*

*2. Claimant be ordered to pay all costs of these arbitral proceedings, and to compensate Respondent for all its costs incurred in these arbitral proceedings, including payments made by Respondent towards the costs of the arbitration, costs for legal representation, internal legal and management costs, and all expenses, plus interests on such amounts at a rate and starting date to be determined in the course of this arbitration, until full and final payment".*

**22.-** By letter dated 23 April 2018, the Secretariat of the Arbitration Court acknowledged receipt of the Respondent's Answer to the Notice of Arbitration and set a deadline to the parties to confer and jointly designate a Sole Arbitrator by no later than 25 May 2018.

**23.-** By letter dated 25 April 2018, this deadline was extended until 29 May 2018.

**24.-** By letter dated 24 May 2018, a copy of which was sent to the Secretariat of the Arbitration Court, the counsels of the Respondent declared on behalf of their client that they *"expressly acknowledge Claimant's first relief sought as set out in V.(i) Notice of Arbitration and, in principle, also Claimant's second relief sought as set out in V.(ii) Notice of Arbitration, latter in the sense that Respondent is willing to bear Claimant's reasonable costs in these arbitration proceedings".* Moreover, the counsels of the Respondent requested the Claimant to provide its costs incurred in this arbitration so far, and declared that it will then inform whether or not he agrees on these costs.

**25.-** By letter dated 29 May 2018, the Claimant noted that the Respondent failed to pay the amounts claimed, despite the acknowledgement of the first relief of the Notice of Arbitration, and declared its intention to pursue the procedure in order to *"record the acknowledgement in the form of an (enforceable) arbitral award".*

7

The Claimant also informed that the parties failed to reach an agreement on the joint designation of the Sole Arbitrator.

**26.-** By letter dated 31 May 2018, the Respondent submitted that due to his express claim acknowledgement, the proceedings would have become unnecessary that there would be nothing left to decide for the Sole Arbitrator and requested the Arbitration Court to terminate the proceedings according to Art. 5(4) of the Swiss Rules.

**27.-** By letter dated 5 June 2018, the Secretariat of the Arbitration Court informed the parties that, after due consideration of parties' respective positions, the Court had decided to proceed with the appointment of a Sole Arbitrator.

**28.-** By letter dated 6 June 2018, the Secretariat of the Arbitration Court informed the undersigned that the Court was considering to appoint him as Sole Arbitrator in this arbitration.

**29.-** By letter dated 7 June 2018, the undersigned confirmed the acceptation of his designation as Sole Arbitrator and sent back the consent to appointment and statement of independence, duly signed, together with his curriculum vitae.

**30.-** On 11 June 2018, the Secretariat of the Arbitration Court informed the parties that the Court had decided to appoint the undersigned as Sole Arbitrator, informed the undersigned of his designation and sent him the file.

**31.-** On 14 June 2018, the Sole Arbitrator wrote to the parties to schedule an organizational meeting, by conference call.

**32.-** By letter dated 2 July 2018, the Sole Arbitrator sent to the parties an organizational meeting agenda, a draft of a Provisional Time-Table and a draft of a Procedural Order No. 1.

**33.-** On 3 July 2018, an organizational meeting took place, by conference call. The agenda items included, but were not limited to, the finalization of a Procedural Order No. 1 and the finalization of a Provisional Time-Table.

**34.-** On 3 July 2018, the Sole Arbitrator notified to the parties a Procedural Order No. 1, a Provisional Time-Table and a Procedural Order No. 2.

**35.-** In the Procedural Order No. 2, a deadline was set to each of the parties to deposit an amount of CHF 35.000.00 as an advance for the costs of the arbitration.

**36.-** On 16 June 2018, the Claimant filed its Statement of Claim, together with exhibits. In its Statement of Claim, the Claimant requested the Sole Arbitrator to :

(i) *ordering Mr Jostein Eikeland to pay Abalith Holdings Limited the sum of USD 7.579.000,00, plus interests at 5% per annum from 18 January 2018 ;*

(ii) *ordering Mr Jostein Eikeland to pay all costs of these arbitration proceedings on a full indemnity basis, including all legal and other costs incurred by Abalith Holdings Limited, plus interests at 5% per annum from the date of the final award ; and*

(iii) *awarding such other relief as might be necessary.*

**37.-** The submissions made by the Claimant in its Statement of Claim can be summarized as follows :

- The dispute is governed by the RA and the laws of Switzerland.

- The Respondent has acknowledged the Claimant's main relief sought, namely the payment of the sum of USD 7.579.112,88, plus interest at 5% per annum from 18 January 2018.

- In reference with the principles of Art. 34(1) of the Swiss Rules, applicable by analogy, the Sole Arbitrator should render an arbitral award ordering the relief sought as regards the payment of an amount of USD 7.579.112,88, plus interests, as a result of the Respondent's desistance, without being obliged to review the merits of the case.

- Alternatively, the Claimant submits that the Respondent failed to pay on time the third quarterly interest that was due on 31 December 2017, according to Art. 5.2 of the RA, so that he was in default pursuant to Art. 102 para. 2 of the Swiss Code of Obligations. The Claimant would thus have been entitled to terminate the Loan with immediate effect, pursuant to Art. 107 para. 2 and 109 of the Swiss Code of Obligations, after having set a final deadline to the Respondent to perform, on 16 January 2018. The termination of the Loan with immediate effect would have triggered the right for the immediate repayment of the principal amount of the Loan and of the accrued interests thereon up to and including the date of 18 January 2018, for a total outstanding amount of USD 7.579.112,88.

9

- Referring to Art. 104 para. 1 of the Swiss Code of Obligations, the Claimant submits that it has a claim for the payment of the default interests of 5% per annum on this amount, as of 18 January 2018.

**38.-** On 21 August 2018, the Sole Arbitrator issued a Procedural Order No. 3, noting that the Respondent did not pay his share of the advance of costs, within the granted time limit, and informing the Claimant that it may make the advance for the costs of the arbitration due by the Respondent, within a deadline on 7 September 2018. Within the above mentioned deadline, the Claimant deposited the requested amount.

**39.-** On 5 September 2018, the Respondent filed a Statement of Defence, together with exhibits. In his Statement of Defence, the Respondent requested the Sole Arbitrator to :

*"1. Terminate the proceedings with an order for termination.*

*2. Terminate the proceedings and decide on the costs of the arbitration in a cost award.*

*3. In the sub-alternative, order Respondent to pay Claimant the sum of USD 7.578.390.40, plus interests at 5% per annum from 23 January 2018.*

*4. Determine and apportion the costs of the present proceedings".*

**40.-** The submissions made by the Respondent in his Statement of Defence can be summarized as follows :

- The Respondent did not raise comments to and did not dispute the Claimant's factual allegations in the Statement of Claim regarding the Loan under the RA, the disbursement of this Loan, the failure to pay the interests, and the termination of the Loan.

- The Respondent submits that he asked the Claimant to provide him with the costs incurred in the present arbitration proceedings, by letter dated 24 May 2018, to decide whether he agrees to pay theses costs as reasonable costs.

- The Claimant would not have provided the Respondent with these costs and it would be the only matter still to be decided in the present arbitration proceedings.

- The Respondent submits that he intended to end the dispute in the most efficient way possible by acknowledging Claimant's claim. In consequence, the proceedings would have become unnecessary due to this claim

10

acknowledgement and the Sole Arbitrator should record the termination of the proceedings in an order for termination.

- It would be sufficient if the Sole Arbitrator determines and apportions the costs in a termination order, as a decision on the costs in a termination order would be considered as an award.

- Alternatively, the Respondent submits that if the Sole Arbitrator comes to the view that he should render an award, this award should be limited to the costs of the arbitration, referring to Art. 5 para. 4 of the Swiss Rules, which provides that if the proceedings become unnecessary before the tribunal is constituted, the Arbitration Court may terminate the proceedings by way of an order of termination.

- For the Respondent, the Sole Arbitrator could not issue a decision ordering payments with respect to the Loan but only order the Respondent to pay the costs of the arbitration proceedings.

- More alternatively, the Respondent submits that the amount of the interests due as from 1 October 2017 would not be in the amount of USD 79.112.88, as calculated by the Claimant, but in the amount of USD 78.390.40. Consequently, the principal amount of the Loan and of the interests on the date of the termination would be USD 7.578.390.40 and not USD 7.579.112.88. The Respondent also submits that its letter dated 18 January 2018, the Claimant stated that if the claimed amount is not received by Abalith Holdings Limited by 22 January 2018, default interests at the statutory rate of 5% would accrue on the outstanding amount, so that the Claimant could only claim default interests as from 23 January 2018.

**41.-** On 11 September 2018, the Sole Arbitrator issued a Procedural Order No. 4, setting a deadline to the Claimant to file further written statements, if it considered it as appropriate, with information as to its legal costs incurred so far in these arbitration proceedings.

**42.-** On 19 September 2018, the Claimant sent a letter to the Sole Arbitrator, submitting that the Respondent did not set forth any defense on the merits, so that it had no reason to file any further written statements in this matter. The Claimant attached to this letter a Provisional Statement of Costs dated 19 September 2018. It was submitted in this document that the Claimant incurred an amount of CHF 6.000.00 as registration fee for the present proceedings, an amount of CHF 70.000.00 as advance on costs for the Claimant and for the Respondent, and an amount of CHF 39.090.00 as legal fees, so that the total costs as of 19 September 2018 would amount to CHF 115.090.00.

PLTS_Ex. "A" -- 15

**43.-**  On 21 September 2018, the Sole Arbitrator issued a Procedural Order No. 5, setting a deadline to the Respondent on 4 October 2018 to file comments on the provisional statement of costs filed for the Claimant, and to file a document indicating his legal costs in the present arbitration proceedings.

**44.-**  By letter dated 4 October 2018, the Respondent informed the Sole Arbitrator that he had no comments on the Respondent's (*recte* Claimant's) Provisional Statement of Costs filed on 19 September 2018 and that the Claimant's (*recte* Respondent's) legal costs amounted to CHF 26.782.75.

**45.-**  On 4 February 2018, the Claimant sent a letter to the Sole Arbitrator, wondering whether it could be assumed that the award will be issued very shortly.

# B. LEGAL DISCUSSION

## I.  In General

**46.-**  In the present case, is that the parties agree on a certain number of points. Firstly, the facts are undisputed. Secondly, in a letter dated 24 May 2018, the Respondent acknowledged the main prayer for relief of the Claimant, namely the claim for the repayment of the principal amount of the Loan, and of the interests for the last quarter of 2017, with default interests. Thirdly, in the Statement of Defence, the Respondent did not challenge the claim for repayment but alternatively objected to the amount claimed for the interests of the last quarter of 2017 and to the starting date of the default interests.

**47.-**  The first issue of the present proceedings is thus the impact of the declaration of the Respondent dated 24 May 2018 regarding the prayers for relief of the Claimant. The Sole Arbitrator will then qualify the impact of this declaration on the arbitration proceedings. Then, the Sole Arbitrator will examine whether this declaration is binding or whether the merits of the case have to be reviewed. If so, the Sole Arbitrator will review the merits of the case.

PLTS_Ex. "A" -- 16

## II. Effect of the declaration dated 24 May 2018 on the arbitral proceedings

### A/ The Issue

**48.-** The issue to be decided by the Sole Arbitrator is whether the declaration made by the Respondent on 24 May 2018 has an impact on the arbitration proceedings, and to which extent.

### B/ The Position of the Parties

**49.-** The Claimant considers that the Sole Arbitrator shall render an arbitral award ordering the prayer for relief accepted by the Respondent. Pursuant to Art. 34(1) para. 2 of the Swiss Rules, the Sole Arbitrator would not be obliged to review the merits of the case or to give reasons on this part of the award.

**50.-** The Respondent considers that, as he has accepted the prayers for relief of the Claimant, the continuation of the proceedings would have become unnecessary and that the Sole Arbitrator should record the termination of the proceedings in an Order for Termination, alternatively only render an award limited to the costs of the arbitration.

### C/ The Decision of the Sole Arbitrator

**51.-** Under the regime of the Swiss Civil Procedure Rules (hereinafter : "SCPR"), if notice of a settlement, acceptance of the claim, or withdrawal of the action is placed on record in Court, the parties must sign the record (see Art. 241 para. 1 of the SCPR). A settlement, acceptance of the claim or withdrawal of the action has the same effect as a binding decision (see Art. 241 para. 2 of the SCPR).

**52.-** The acceptance is considered by the Swiss scholars as a unilateral act by which a party recognizes the merits of the claim of the other party and admits the prayers for relief of this other party (see Denis Tappy, *Commentaire romand du Code de procédure civile*, 2nd ed., Basel 2019). This figure of the acceptance subject to Art. 241 of the Swiss Civil Procedure Rules corresponds to a mechanism that was provided in former Cantonal Civil Procedure Codes, as *"Passé expedient"* or *"Abstand"*.

**53.-** The Swiss Rules of International Arbitration do not contain an explicit provision concerning the unilateral acceptance, by one of the parties, of the prayers for relief of the other party. It is considered by some scholars that in the case of a

PLTS_Ex. "A" -- 17

unilateral acceptance, Art. 34 para. 1 of the Swiss Rules is to be applied by analogy.

**54.-**  Art. 34 of the Swiss Rules is entitled *"Settlement or other ground for termination"*. It reads as follows :

> *"1. If, before the award is made, the parties agree on a settlement of the dispute, the arbitral tribunal shall either issue an order for the termination of the arbitral proceedings or, if requested by the parties and accepted by the arbitral tribunal, record the settlement in the form of an arbitral award on agreed terms. The arbitral tribunal is not obliged to give reasons for such an award.*

> *2. If, before the award is made, the continuation of the arbitral proceedings becomes unnecessary or impossible for any reason not mentioned in Art. 34(1), the arbitral tribunal shall give advance notice to the parties that it may issue an order for the termination of the proceedings. The arbitral tribunal shall have the power to issue such an order, unless a party raises justifiable grounds for objection.*

> *3. Copies of the order for termination of the arbitral proceedings or of the arbitral award on agreed terms, signed by the arbitrators, shall be communicated by the arbitral tribunal to the parties and to the Secretariat. Where an arbitral award on agreed terms is made, Art. 32(2) and (4) to (6) shall apply".*

**55.-**  In his commentary on Art. 34 of the Swiss Rules published in 2013, Maurice Courvoisier considered that the acceptance of the claim by Respondent usually results in the termination of the proceedings pursuant to Art. 34 para. 2 of the Swiss Rules. Maurice Courvoisier considered that *"In the case of a unilateral declaration of desistance by Respondent, the arbitral tribunal, upon Claimant's request, should render an arbitral award, granting Claimant's claim as a result of Respondent's desistance and that an order for termination would not adequately protect Claimant's interests, namely because it would not provide Claimant with an enforceable instrument"* (see Maurice Courvoisier, in : Manuel Arroyo (ed.), Arbitration in Switzerland, The Practitioner's Guide, Kluwer Law International 2013, para. 21 ad Art. 34 of the Swiss Rules). In the new edition of this commentary, Maurice Courvoisier seems to slightly modify his opinion and considers that *"Acceptance of the Claim by Respondent does not result in the termination of the proceedings pursuant to Art. 34 (2) : acceptance of the Claim may be prompted by a settlement agreement, in which case Art. 34 (1) applies but may also occur in the form of a unilateral declaration by Respondent. In the latter case, the Arbitral Tribunal will render an arbitral award (granting Claimant's claim as a result of Respondent's acceptance), to provide Claimant*

PLTS_Ex. "A" -- 18

with an enforceable instrument and to trigger the res judicata effect (see Maurice Courvoisier, in : Manuel Arroyo (ed.) Arbitration in Switzerland, The Practitioner's Guide, 2nd edition, Kluwer Law International 2018, para. 20 ad Art. 34 of the Swiss Rules).

**56.-** According to Bernhard Berger and Franz Kellerhals, *"an acceptance of claim has a dual nature. In relation to the merits of the dispute, it means that the respondent waives any plan that the claimant's claim shall be dismissed. In terms of procedure, it leads to the termination of the proceedings. An acceptance of claim may result from (i) a settlement agreement between the parties or (ii) a unilateral declaration of desistance addressed by the respondent to the arbitral tribunal (and the claimant) (…). In the second scenario, the arbitral tribunal shall, at the request of the claimant, render an arbitral award granting the claimant's claims as a result of the respondent's desistance. The purpose of such award is to provide the Claimant with an instrument permitting recognition and enforcement, and to prevent that the same cause of action between the same parties may be reargued at any later date (res judicata)"* (see Bernhard Berger / Franz Kellerhals, International and Domestic Arbitration in Switzerland, 3rd ed., 2015, para. 23, pp. 545-546).

**57.-** In the Commentary of the Swiss Rules of International Arbitration edited by Tobias Zuberbühler, Christoph Müller and Philipp Habegger, concerning Art. 34 of the Swiss Rules, Mark Veit and Anna Masser do not address the question of the acceptance of the claim. They develop considerations in connection with the withdrawal of the claim. They consider that *"After the Respondent has submitted its Statement of Defence, a simple withdrawal of the claim without res judicata effect should only be possible with the agreement of the respondent. If the respondent objects to a simple withdrawal of the claim after the Statement of Defence has been submitted, the Arbitral Tribunal must continue the proceedings and eventually render an award"* (see Mark Veit / Anna Masser, in : Zuberbühler / Müller / Habegger (eds), Swiss Rules of International Arbitration, Commentary, 2nd ed., Zurich 2013, para. 24 ad Art. 34).

**58.-** Contrary to the Swiss Civil Procedure Rules, the Swiss Rules do not provide for an explicit provision regarding the acceptance of the claim. The Sole Arbitrator considers that this silence is not a *lacuna*. If the drafters of the Swiss Rules had the intention to regulate the situation of the acceptance of the claim, they would have drafted an explicit provision, or supplemented Art. 34 of the Swiss Rules with the hypothesis of the acceptance. As it is not the case, it is to be considered that the acceptance of a prayer for relief has no automatic impact on the arbitral proceedings, contrary to what is provided by Art. 241 of the SCPR, for example, which provides that in case of acceptance, the Court shall dismiss the proceedings.

PLTS_Ex. "A" -- 19

**59.-** Whatsoever, the Sole Arbitrator notes that Art. 34 of the Swiss Rules leaves the arbitral tribunal with a large level of discretion, as regards the effect on the arbitral proceedings. In the case of a settlement (Art. 34 para. 1 of the Swiss Rules), the arbitral tribunal shall render an order for termination, or an arbitral award on agreed terms, if requested by the parties. In the other cases where there is a ground for termination (Art. 34 para. 2 of the Swiss Rules), the arbitral tribunal shall have the power to issue an order for termination but has apparently no obligation to do so.

**60.-** It also results from the above mentioned opinions of the scholars that in case of acceptance, the arbitral tribunal may render an arbitral award, in order to protect the interests of the Claimant.

**61.-** In the present case, the Claimant has requested that the Sole Arbitrator shall render an award. It seems obvious that the Claimant has an interest to have an award issued on its claim, in the view of the recognition and enforcement proceedings. As there is no provision in the Swiss Rules providing that an acceptance leads automatically to an Order for Termination, as the Claimant requested for an award and as an Order for Termination would not adequately protect the Claimant's interests, the Sole Arbitrator shall not limit his decision to an Order for Termination but render an award on the merits.

## III.   Effect of the declaration of 24 May 2018 on the substance of the case

### A/   The Issue

**62.-** The issue to be decided by the Sole Arbitrator is whether the acceptance declared in the letter dated 24 May 2018 is to be considered as a full and final admission of the claim as expressed by the Claimant in the prayers for relief, or whether any challenge or objection of the Respondent, as regards the principle or the amount of the claim, is to be tried.

PLTS_Ex. "A" -- 20

**B/    The Position of the Parties**

**63.-**    The Claimant submits that the Sole Arbitrator is not obliged to review the merits of the case or to give reasons in the award for this part of the claim.

**64.-**    The Respondent submits, alternatively, that the amount of the interests as from 1 October 2017 until 31 December 2017 has been wrongly calculated by the Claimant and that the starting date of the default interests is not on 18 January 2018, but on 23 January 2018.

**C/    The Decision of the Sole Arbitrator**

**65.-**    As exposed here over, there is no specific provision in the Swiss Rules as regards the impact or effect of the acceptance, by one of the parties, of the prayer for relief of the other party. This is not peculiar, as it is to be considered that this issue is to be examined under the law applicable to the substance of the case.

**66.-**    In this matter, the dispute is governed by the laws of Switzerland, according to Art. 16 of the RA, which provides that the RA *"is subject to, shall be construed in accordance with and governed by the laws of Switzerland"*. The applicable law agreed upon by the parties, according to Art. 33 of the Swiss Rules, does not govern the procedure of the arbitration (see Sébastien Besson / Nina Thommesen, in : Zuberbühler / Müller / Habegger (eds), Swiss Rules of International Arbitration, Commentary, 2nd ed., Zurich 2013, para. 3 ad Art. 33. Furthermore, the discretionary power of the Arbitral Tribunal as regards the conduct of the arbitration is subject to limitations which are, amongst others, the Swiss Rules themselves (see Andrea Gamba / Cesare Jermini, in : Zuberbühler / Müller / Habegger, in : Zuberbühler / Müller / Habegger (eds), para. 4 ad Art. 15. In the present case, the Sole Arbitrator considers that the choice of law of the parties is limited to the application of the Swiss material rules and does not encompass the application of the Swiss Civil Procedural Rules, namely Art. 241 SCPR. Moreover, the Sole Arbitrator considers that there is no *lacuna* in the Swiss Rules, and that it is logical that the effect or impact of the acceptance of the claim by the Respondent is governed according to the material law applicable to the dispute, which does not encompass the Civil Procedure Rules of the chosen law.

**67.-**    Under Swiss Law, an acknowledgment of debt is defined as the declaration in which a debtor expresses to a creditor that a specific debt is existing (see

PLTS_Ex. "A" -- 21

decision of the Swiss Supreme Court 4A_17/2009, cons. 3.2 and Silvia Tevini, in : *Commentaire Romand du Code des Obligations I*, 2nd ed., Basel 2012, para. 1 ad Art. 17). This definition results from the case law of the Swiss Supreme Court and is not to be found in the statutes under Swiss Law, namely in the Swiss Code of Obligations. The Swiss Code of Obligations mentions an acknowledgment of debt under art. 17, with provides that *"an acknowledgment of debt is valid even if it does not state the cause of the obligation"*, but does not define the acknowledgement of debt any further.

**68.-** According to the Swiss legal scholars, an acknowledgment of debt is a unilateral declaration of the one which considers to be the debtor (see Silvia Tevini, *op. cit.*, para. 4 ad art. 17). There are no formal requirements for an acknowledgment of debt. It can be declared orally or be stated in writing (see Silvia Tevini, *op. cit.* n. 5 ad art. 17).

**69.-** An acknowledgment of debt does not prevent the debtor to raise any objection or exceptions which were existing (see decision of the Swiss Supreme Court 4A_275/2009, cons. 3). Art. 17 of the Swiss Code of Obligations has then no impact on the material existence of the obligation of the debtor. The effect of an acknowledgment of debt is to switch the burden of proof. The creditor does not need to evidence the cause of the claim, nor the fulfilment of other conditions but the ones indicated in the act of acknowledgement. It is then to the debtor challenging the debt to establish the cause of the obligation and to prove that this cause is not valid, for instance because the legal relationship based on the acknowledgments is not existent, null and void, invalidated or simulated. The debtor may generally invoke any objection or exception (performance, extinction by agreement, *exceptio non adimpleti contractus*, limitation period and so on and so forth) which are directed against the claim acknowledged (see decision of the Swiss Supreme Court, 131 III 268, cons. 3.2, and references cited).

**70.-** In the present case, the Respondent has declared, by letter dated 24 May 2018, that he expressly acknowledges Claimant's first relief sought as set out in V (i) Notice of Arbitration. This declaration has to be construed as the acknowledgement, by the Respondent, of the Prayer for relief requesting Mr Eikeland *"to pay Abalith Holdings Limited the sum of USD 7.579.112.88, plus interest at 5 % per annum from 18 January 2018"*.

**71.-** The letter dated 24 May 2018 is clearly a declaration that the Respondent admits the existence of the claim formulated by the Claimant in the first Prayer for relief of the Notice of Arbitration dated 14 March 2018. It is to be qualified as an acknowledgment of debt under Swiss Law.

**72.-** In his Statement of Defence dated 5 September 2018, the Respondent admitted that he acknowledged the claim, by letter dated 24 May 2018. The Respondent

18

however linked this acknowledgment of debt with a Request for a Termination Order to close the proceedings, limited to the costs of the Arbitration, alternatively to an award limited to the costs of the Arbitration. Even more alternatively, the Respondent raised objections against the claim, concerning the amount of the interests, and the starting date of the default interests.

73.- As considered here above, the acceptance of a Prayer for relief does not automatically lead to a Termination Order, as regards the proceedings. Furthermore, as regards the substance, the acknowledgment of debt does not extinguish the claim, such as payment or performance. In consequence, also as regards the substance, the Sole Arbitrator considers that the position of the Respondent that there is no more issue to be decided than the costs of the arbitration cannot be followed. Moreover, it cannot be considered that the continuation of the arbitral proceedings would have become unnecessary. Even if the claim has been acknowledged, the extinction of the debt did not occur and it is still necessary to order the payment of the claim, the acknowledgment of debt under Swiss law being limited to a switch of the burden of proof, as exposed here over.

74.- As also considered here over, the acknowledgment of debt does not prevent the debtor to raise objections against the claim. In the present case, the acknowledgment of the debt has been confirmed in the Statement of Defence, but objections have been filed alternatively. One could doubt whether it is admissible to raise alternative objections or whether the Respondent has to choose, between the acknowledgment of debt and the submission of objections.

75.- The Sole Arbitrator considers that it is admissible to raise alternative objections and that the submissions of the Respondent, in the present case, have to be construed as an acknowledgment of debt, up to an amount of CHF 7.578.390.40, with interest at 5 % per annum as from 23 January 2018. It is then to be reviewed whether the amount of the interest for the last quarter is accurate and whether the starting date of the default interest is correct.

76.- As regards the interest up to the termination of the Loan, the Respondent limits his objections to affirm that the 3.5 % interest amount from 1st October 2017 until and including 18 January 2018 does not amount to USD 79.112.88, but to USD 78.390.40.

The principal amount of the loan is of USD 7.500.000.-. Considering that this amount carries interest at 3.5 % per annum, the sum of the yearly interest amount to USD 262.500.-. Then, the amount of the daily interest is USD 719.178.08 (262.500.00 : 365). There are 110 days between 1 October 2017

PLTS_Ex. "A" -- 23

and 18 January 2018. In consequence, the amount of the interest due up to 18 January 2018 is USD 79.109.59.

**77.-** In the view of the above mentioned, the Respondent shall pay to the Claimant an amount of USD 7.579.109.59, which is the principal amount of the loan (USD 7.500.000), plus the amount of the interests due between 1 October 2017 and 18 January 2018.

**78.-** The Respondent also submits that the starting date of the default interests is not 18 January 2018, but 23 January 2018, as the counsel of the Claimant has declared in a letter dated 18 January 2018 that if the amount due is not received by 22 January 2018, default interests at the statutory rate of 5% would accrue on the outstanding amount (see para. 16 hereabove).

**79.-** Under Swiss law, the regime of the default interests is regulated by Art. 104, 105 and 106 of the Swiss Code of Obligations.

**80.-** Pursuant to Art. 104, *"A debtor in default on payment of a pecuniary debt must pay default interests of 5% per annum even where a lower rate of interests was stipulated by contract"*.

**81.-** According to the Swiss legal scholars (see Luc Thévenoz, in : *Commentaire romand du Code des obligations I*, 2nd ed., Basel 2012, para. 9 ad Art. 104), the default interests start to run as from the day after :

- the deadline for performance of the obligation or the end of the deadline set by the contract to perform the obligation (see Art. 102 para. 2 of the Swiss Code of Obligations, which reads as follows : *"Where a deadline for performance of the obligation has been set by agreement or as a result of a duly exercised right of termination reserved by one party, the obligor is automatically in default on expiry of the deadline"*) ;

- the receipt, by the debtor, of the formal reminder provided by Art. 102 par 1, which reads as follows : *"Where an obligation is due, the obligor is in default as soon as he receives a formal reminder from the obligee"*.

**82.-** In the present case, it is to be distinguished between two different claims. The claim for the payment of the quarterly interests was subject to a deadline for performance set in the RA. Pursuant to section 5.2 of the RA, the Loan carries interests of 3.5% per annum, accrued and payable quarterly, starting from 1 April 2017. Hence, under the regime of Art. 104 of the Swiss Code of Obligations, it could be considered that default interests are due as from the day after the deadline for performance set in the contract which is, for the last

quarter of 2017, the 1st or 2nd January 2018, depending on the public holiday at the place of performance. However, this regime is not applicable to a claim for interests, for which a special rule is provided by Art. 105 para. 1 of the Swiss Code of Obligations. This provision reads as follows : *"A debtor in default on payment of interests, annuities or gifts is liable for default interests only as of the day on which enforcement proceedings are initiated or legal action is brought"*.

**83.-**    In the present case, default interests on the claim for interests could only start as from the filing of the arbitration proceedings.

**84.-**    It is nevertheless to be considered that the Respondent has recognized the claim for default interests, limiting his objection against this claim, in the sense that the starting date of the default interests at 5% per annum is to be fixed on 23 January 2018, and not on 18 January 2018. In consequence, the Sole Arbitrator shall consider that default interests on the interests (for the last quarter of 2017 and for the period between 1 January and 18 January 2018) are to be awarded as from 23 January 2018.

**85.-**    As regards the principal amount of the loan, Art. 102 para. 1 is to be applied and the default interests shall run as from the moment when the obligor receives a formal reminder from the obligee.

**86.-**    The rules and principles applicable to the reception of a declaration, under Swiss law, are then to be examined. According to the Swiss legal scholars, the formal reminder is received when it enters into the sphere of control (sphère de puissance) of the obligor, which carries the risk of the lack of effective awareness of the reminder (see Luc Thévenoz, in : *Commentaire romand du Code des Obligations I*, 2nd ed, Basel 2012, para. 19 ad Art. 102).

**87.-**    In the present case, the Respondent has acknowledged receipt of the letter dated 18 January 2018, in an e-mail dated 23 January 2018. In this e-mail, the Respondent declared that he received the letter dated 18 January 2018 *"with your below e-mail"*. The below e-mail to which the Respondent refers is an e-mail dated 18 January 2018, sent on behalf of the Board of Directors of Abalith Holdings, to the Respondent, at 10.18 am.

**88.-**    It results from the documents provided that the communication between the parties went through exchange of e-mails. For instance, the Respondent and the representative of the Claimant were in touch through e-mails in October 2017, regarding the payment of the interests for the third quarter, at the beginning of October 2017. Later on, in January 2018, e-mails were also exchanged between the representative of the Claimant and the Respondent

PLTS_Ex. "A" -- 25

(e-mail sent to the Respondent by the representative of the Claimant on 9 January 2018 and answer of the Respondent of 15 January 2018).

**89.-**   In the view of the above mentioned, the Sole Arbitrator considers that the parties were willing and agreed to communicate through e-mails, and were ready to receive communications, information or reminders through e-mails. As there is no objection that the e-mail of the representative of the Claimant dated 18 January 2018 has been received in the e-mail inbox of the Respondent on the same day, it is to be considered that the letter attached to this e-mail entered into the sphere of awareness of the Respondent on 18 January 2018. In the view of the above mentioned, it can be considered that the debtor received the formal reminder for the repayment of the principal amount of the Loan, according to Art. 102 para. 1 of the Swiss Code of Obligations, on 18 January 2018.

**90.-**   As the Respondent points out, in its letter terminating the Loan, the Claimant set a deadline for repayment, on 22 January 2018. It is considered by the Swiss legal scholars that a formal reminder indicating a payment deadline has to be considered as a term reminder (*Befristete Mahnung or Interpellation à terme*). For an example, an invoice indicating that the payment is due within a thirty days deadline has an effect, as regards default interests, at the end of this payment deadline only (see Luc Thévenoz, in : *Commentaire romand du Code des Obligations I*, 2nd ed., Basel 2012, para. 24 ad Art. 102).

**91.-**   The indication, in the letter dated 18 January 2018, that if the payment is not received by 22 January 2018, default interests will accrue on the outstanding amount, is clearly to be construed as a payment deadline. Moreover, it is very unlikely that it would be possible, for a debtor, to pay an amount of around USD 7.500.000,-, on the day when the formal reminder is received. It is thus to be considered that it cannot be required from a debtor, to pay such an amount on receipt of the formal reminder. The Sole Arbitrator notes that even in the deadline set in the letter dated 18 January 2018, which is of three working days, the payment of the amount requested before 23 January 2018 could have been difficult for business and technical reasons. Nevertheless, the formal reminder dated 18 January 2018 was effective as of the day after the payment deadline, which is on 23 January 2018. In consequence, the default interests on the principal amount of the Loan are due as from this 23 January 2018, which corresponds to what has been acknowledged by the Respondent.

**92.-**   In the view of the above mentioned, the Sole Arbitrator considers that default interests are to be awarded on the principal amount of the loan, as from 23 January 2018, and on the interests, as from 23 January 2018 also.

PLTS_Ex. "A" -- 26

## III.   The Arbitration costs and the Legal Expenses of the Parties

### A/   The Issue

**93.-**   The issue to be decided by the Sole Arbitrator is how to allocate the costs of the proceeding.

### B/   The Position of the Parties

**94.-**   The position of the Claimant is expressed in its Provisional Statement of Costs dated 18 September 2018, and can be summarised as follows :

- The Claimant submits that the Respondent agreed in a letter dated 24 May 2018 to bear the Claimant's costs in the present arbitration proceedings.

- The Claimant requests the reimbursement of the registration fee paid for the present proceedings, in the amount of CHF 6.000.00, and the reimbursement of its share of the advance on costs, in the amount of CHF 35.000.00, paid on 30 July 2018, and of the share of the advance on costs of the Respondent also on the amount of CHF 35.000.00, paid by the Claimant on 7 September 2018. The total amount requested by the Claimant, as regards the advance on costs, is of CHF 70.000.00, plus CHF 6.000.00 for the registration fee.

- The Claimant furthermore requests for the payment of its legal fees in relation to the present proceedings, in the amount of CHF 39.090.00, corresponding to the invoices of its legal representative Lenz & Staehelin, for the period between 10 January 2018 to 19 September 2018.

- The total of costs requested by the Claimant then amounts to CHF 115.090.00.

**95.-**   The position of the Respondent is summarised as follows :

- The Respondent has no comments on the Claimant's Provisional Statement of Costs filed on 18 September 2018, which is summarized hereabove.

- The Respondent's legal costs invoiced by his legal representative on 4 October 2018 amount to CHF 26.782.75. There is in addition an amount of

CHF 2.094.20 not yet invoiced for the period between 1 September 2018 and 4 October 2018.

**C/      The Decision of the Sole Arbitrator**

**96.-**    According to Art. 38 of the Swiss Rules, the Award shall contain a determination of the costs of the arbitration, which include only (a) the fees of the arbitral tribunal to be stated separately as to each arbitrator and any secretary, and to be determined by the tribunal itself in accordance with Art. 39 and 40 (3) to (5) of the Swiss Rules ; (b) the travel and other expenses incurred by the arbitral tribunal and any secretary ; (c) the costs of expert advice and of other assistance required by the arbitral tribunal ; (d) the travel and other expenses of witnesses, to the extent such expenses are approved by the arbitral tribunal ; (e) the costs for legal representation and assistance, if such costs were claimed during the arbitral proceedings, and only to the extent that the arbitral tribunal determines that the amount of such costs is reasonable ; (f) the Registration Fee and the Administrative Costs in accordance with Appendix B (Schedule of Costs) ; and (g) the Registration Fee, the fees and expenses of any emergency arbitrator, and the costs of expert advice and of other assistance required by such emergency arbitrator, determined in accordance with Art. 43 (9) of the Swiss Rules.

**97.-**    Art. 39 of the Swiss Rules provides that the fees and expenses of the arbitral tribunal shall be reasonable in amount, taking into account the amount in dispute, the complexity of the subject-matter of the arbitration, the time spent and any other relevant circumstances of the case, including the discontinuation of the arbitral proceedings in case of settlement. In the event of discontinuation of the arbitral proceedings, the fees of the arbitral tribunal may be less than the minimum amount resulting from Appendix B (Schedule of Costs).

**98.-**    Art. 40 of the Swiss Rules reads as follows :

*"1. Except as provided in Art. 40 (2), the costs of the arbitration shall in principle be borne by the unsuccessful party. However, the arbitral tribunal may apportion any of the costs of the arbitration among the parties if it determines that such apportionment is reasonable, taking into account the circumstances of the case.*

*2. With respect to the costs of legal representation and assistance referred to in Art. 38 (e), the arbitral tribunal, taking into account the circumstances of the case, shall be free to determine which party shall bear such costs or may apportion such costs among the parties if it determines that an apportionment is reasonable.*

24

*3. If the arbitral tribunal issues an order for the termination of the arbitral proceedings or makes an award on agreed terms, it shall determine the costs of the arbitration referred to in Art. 38 and 39 in the order or award.*

*4. Before rendering an award, termination order or decision on a request under Art. 35 to 37, the arbitral tribunal shall submit to the Secretariat a draft thereof for approval or adjustment by the Court of the determination on costs made pursuant to Art. 38 (a) to (c) and (f) and Art. 39. Any such approval or adjustment shall be binding upon the arbitral tribunal.*

*5. No additional costs may be charged by an arbitral tribunal for interpretation, correction, or completion of its award under Art. 35 to 37, unless they are justified by the circumstances".*

**99.-**   Art. 40 (1) of the Swiss Rules provides that the costs of the arbitration shall in principle be borne by the unsuccessful party. In the present case, the Sole Arbitrator does not see any circumstances justifying an exception to this principle. The Claimant is awarded the full amount of his claim, with a very minor deduction, as regards the interests and as regards the starting date of the default interests. The unsuccessful party is then clearly the Respondent. As a result, the Respondent will have to bear the costs of this arbitration, including the bank charges, which are determined in the next paragraphs.

**100.-**   The Sole Arbitrator incurred no expenses in the present proceedings. The fees of the Sole Arbitrator are to be calculated according to Appendix B (Schedule of Costs, para. 6.1). The amount in dispute has firstly to be fixed. In the present case, the Sole Arbitrator considers that the amount in dispute is USD 7.579.112.88. Converted into Swiss Francs at the rate of exchange applicable at the time the Notice of Arbitration had been received by the Secretariat, which is on 15 March 2018 (see Appendix B, para. 2.6), the amount in dispute is CHF 7.159.630.00. The Sole Arbitrator shall limit his fees to CHF 49.803.00. The total of the fees and expenses of the Sole Arbitrator thus amounts to CHF 49.803.00.

The administrative costs in this arbitration, calculated according to Appendix B (Schedule of Costs, para. 6.1) amount to CHF 14.319.00.

The bank charges incurred in this arbitration (bank fees and negative interests) amount to CHF  454.34 on 10 April 2019.

Therefore, the total cost of the arbitration born by the Respondent amounts to CHF 64'576.34(64.122.00 + 454.34).

**101.-** A total amount of CHF 70.000.00 has been paid by the Claimant, as an advance on the costs of the arbitration. As the total costs of this arbitration amount to CHF 64.576.34, there is a remaining balance of the advance on costs, of CHF 5.423.66. The amount of this remaining balance shall be reimbursed to the Claimant.

**102.-** The Respondent also has to bear the registration fee of CHF 6.000.00, which was paid by the Claimant upon filing of the Notice of Arbitration.

**103.-** In addition, the Respondent has to bear the reasonable costs for legal representation and assistance of the Claimant.

**104.-** The Claimant requested the payment of the following costs : CHF 39.090.00 for its lawyer's fees. With regard to the submissions filed in the present proceedings and to the amount at stake, and considering that the Respondent declared that he had no comments on the Claimant's Provisional Statement of Costs, the Sole Arbitrator allows to the Claimant the amount it requested, for the costs of its legal representative.

**105.-** As a result, the Respondent is ordered to pay to the Claimant the reasonable costs for legal representation and assistance, which amount to CHF 39.090.00.

\* \* \* \* \*

PLTS_Ex. "A" -- 30

# C. AWARD

**I.-**   Mr Jostein Eikeland must pay Abalith Holdings Limited an amount of USD 7.579.109.50 (seven million five hundred seventy-nine thousand one hundred nine and fifty), with interests at the rate of 5% per annum as of 23 January 2018 until the date of full payment.

**II.-**   Mr Jostein Eikeland must bear the fees of the Sole Arbitrator, which amount to a total of CHF 49.803.00 ; as a result, Mr Jostein Eikeland must pay Abalith Holdings Limited an amount of CHF 49.803.00 (forty-nine thousand eight hundred three).

**III.-**   Mr Jostein Eikeland must bear 100% of the costs of arbitration, fixed at CHF 14.773.34 ; as a result, Mr Jostein Eikeland must pay Abalith Holdings Limited an amount of CHF 14.773.34 (fourteen thousand seventy-seven three hundred and thirty-four).

**IV.-**   Mr Jostein Eikeland must bear the reasonable costs for legal representation and assistance of Abalith Holdings Limited ; as a result, Mr Jostein Eikeland must pay Abalith Holdings Limited an amount of CHF 39.090.00 (thirty-nine thousand ninety hundred).

**V.-**   All other claims, prayers for relief and/or procedural requests of the parties are hereby dismissed.

Geneva, 8 April 2019

Luc Pittet, Sole Arbitrator

27

# Exhibit B

# REORGANISATION AGREEMENT

dated December 5, 2016

between

**Mr. Jostein EIKELAND**, Zumettas 13, 1936 Verbier, Switzerland

("JE")

and

**ABALITH HOLDINGS LIMITED**, Arch. Makariou III, 195, Neocleous House, 3030 Limassol, Cyprus

("Abalith")

and

**GINGERPATH LIMITED**, Arch. Makariou III, 195, Neocleous House, 3030 Limassol, Cyprus

("Gingerpath")

regarding

**the Reorganization of the Shareholding in and the Financing of**

**ALEVO GROUP SA**

  

- 2 -

This **REORGANISATION AGREEMENT** (the **"Agreement"**) is entered into on this 5 day of December, 2016, between JE, Abalith and Gingerpath (JE, Abalith, and Gingerpath each a **"Party"**, collectively the **"Parties"**).

**WHEREAS**

    **PARTIES**

(A)   JE is a Norwegian citizen, resident at Zumettas 13, 1936 Verbier, Switzerland.

(B)   Abalith is a limited company organized under the laws of Cyprus and registered with the Registrar of Companies of Cyprus under number HE 270175, having its registered office at Arch. Makariou III, 195, Neocleous House, 3030 Limassol, Cyprus.

(C)   Gingerpath is a limited company organized under the laws of Cyprus and registered with the Registrar of Companies of Cyprus under number HE 351930, having its registered office at Arch. Makariou III, 195, Neocleous House, 3030 Limassol, Cyprus. Gingerpath has a share capital of CHF 30,000, divided into 22,414,128 non-classified shares of CHF 0.001 each and 7,585,872 ordinary shares of CHF 0.001 each and issued share capital 7,585,872 ordinary shares of CHF 0.001 each (the **"Gingerpath Shares"**). Gingerpath is owned by JE and Abalith. JE holds 4,366,666 Gingerpath Shares representing 57.56% of the issued share capital and Abalith holds 3,219,206 Gingerpath Shares representing 42.44% of the issued share capital.

(D)   ALEVO GROUP SA is a corporation organized under the laws of Switzerland and registered with the Commercial Register of Bas-Valais under number CHE-482.059.639, having its registered office at Rue des Finettes 110, 1920 Martigny (**"Alevo"**). Alevo currently has a share capital of CHF 163,596.40, divided into 16,359,640 registered shares (with transfer restriction) with a par value of CHF 0.01 each (the **"Alevo Shares"**).

(E)   The shareholding in Alevo currently presents itself as follows (all approximations):

| Shareholders | Number of Shares | % | Convertibles, Options, Warrants, etc. | Fully Diluted Total Shares Held | Total % |
|---|---|---|---|---|---|
| Gingerpath | 7,585,872 | 46.4% | 1,800,000 | 9,385,872 | 45.1% |
| Abalith | 3,335,704 | 20.4% | 1,667,852 | 5,003,556 | 24.0% |
| JE | 363,418 | 2.2% | | 363,418 | 1.7% |
| Clydemont | 59,752 | 0.4% | 4,687 | 64,439 | 0.3% |
| Unrelated parties | 5,014,894 | 30.7% | 977,926 | 5,992,820 | 28.8% |
| **Total** | **16,359,640** | **100%** | **4,450,465** | **20,810,105** | **100%** |

(F)   Gingerpath currently holds 7,585,872 Alevo Shares, option rights to buy 500,000 Alevo Shares from Alevo at a price of CHF 80 per share, and 1,300,000 warrants to subscribe Alevo Shares at a price of CHF 120 per share.

- 3 -

(G)   On February 19, 2016, JE and Abalith have entered into a shareholders' agreement governing their relationship as shareholders of Gingerpath (the **"Shareholders' Agreement"**).

(H)   The Parties now wish to reorganize their mutual relationship with a view to refinance Alevo and to ensure its survival for the next years. To that effect (a) the Shareholders' Agreement shall be terminated; (b) the Gingerpath Shares held by JE shall be transferred to Abalith; (c) the 3,219,206 Alevo Shares held by Gingerpath shall be distributed to Abalith; (d) the remaining 4,366,666 Alevo Shares held by Gingerpath shall remain with Gingerpath to be later distributed to JE on certain conditions, it being understood that JE shall nevertheless be able to exercise the voting rights over these Alevo Shares by issuing binding voting instructions to Gingerpath; (e) a plan for a new funding of Alevo shall be set up; (f) Abalith shall grant a personal loan to JE; and (g) the staffing of the function of the CEO of Alevo shall be regulated.

(I)   This Agreement sets out the terms of the reorganization and funding described above and the rights and obligations of the Parties in connection therewith.

**NOW, THEREFORE,** the Parties agree as follows:

**1   TERMINATION OF SHAREHOLDERS' AGREEMENT**

1.1   In accordance with Section 28.2 of the Shareholders' Agreement, the Shareholders' Agreement is hereby terminated with immediate effect by mutual written consent of JE and Abalith, which shall be evidenced by their signature of this Agreement.

1.2   Consequently, JE and Abalith shall cease to be bound by the provisions of the Shareholders' Agreement, with the exception of the provisions in Section 29 of the Shareholders' Agreement (Confidential Information), which shall survive its termination, in accordance with Section 28.4 of the Shareholders' Agreement.

1.3   Contrary to the stipulation in Section 28.5 of the Shareholders' Agreement, JE and Abalith hereby expressly agree and acknowledge that Gingerpath shall not be liquidated, but shall continue to exist for an indefinite duration with Abalith as its sole shareholder, in accordance with Section 2.2 below.

**2   TRANSFER OF GINGERPATH SHARES TO ABALITH**

2.1   JE hereby sells and transfers to Abalith, which purchases and accepts such transfer, all 4,366,666 Gingerpath Shares held by JE, free of any liens encumbrances or rights of third-parties, with all rights attached thereto for a consideration of CHF 1 (one Swiss Franc), to be paid by Abalith to JE in cash, immediately after the signing of this Agreement.

2.2   To that effect, the JE and Abalith sign simultaneously with this Agreement an instrument of transfer of shares regarding the transfer of the 4,366,666 Gingerpath Shares, attached hereto as Appendix A. Moreover, the Parties take note of the resolutions of the shareholders and the board of directors of Gingerpath, attached hereto as Appendix B.



- 4 -

2.3     In addition, JE and Abalith shall make any declarations, notifications and deliveries, sign any documents, and perform any other acts as may be necessary or useful to bring about the valid transfer of the Gingerpath Shares to Abalith. In addition, JE and Abalith shall ensure that the board of directors of Gingerpath approves the transfer and accepts the registration of Abalith as the sole shareholder of Gingerpath in its share ledger.

2.4     Any costs for the sale and transfer of the Gingerpath Shares to Abalith shall be borne by Abalith. Each Party bears its own taxes in connection with the transfer.

## 3      TRANSFER OF ALEVO SHARES AND VOTING RIGHTS

### A.      TRANSFER OF ALEVO SHARES AND RIGHTS TO ABALITH

3.1     Gingerpath hereby transfers to Abalith, which accepts such transfer, 3,219,206 Alevo Shares held by it, free of any liens encumbrances or rights of third-parties, with all rights attached thereto, for a consideration corresponding to the fair market value of the Alevo Shares.

3.2     To that effect, Gingerpath signs simultaneously with this Agreement and delivers to Abalith a written assignment declaration in the form attached hereto as <u>Appendix C</u>.

3.3     Each Party shall ensure that, where necessary, the board of directors of Alevo shall arrange for Abalith to be validly registered in the share register of Alevo as the shareholder of the 3,219,206 Alevo Shares.

3.4     In addition, Gingerpath hereby transfers to Abalith, which accepts such transfer:

3.4.1     option rights to buy 250,000 Alevo Shares from Alevo at a price of CHF 80 per share; and

3.4.2     650,000 warrants to subscribe Alevo Shares at a price of CHF 120 per share;

free of any liens encumbrances or rights of third-parties, with all rights attached thereto, for a consideration corresponding to the fair market value of such rights.

3.5     Each Party shall make any declarations, notifications and deliveries, sign any documents, and perform any other acts as may be necessary or useful to bring about the transfer of the Alevo Shares (as described in Section 0 above) and the option and warrant rights (as described in Section 3.4 above) to Abalith.

### B.      EXERCISE OF VOTING RIGHTS ON REMAINING ALEVO SHARES

3.6     The remaining 4,366,666 Alevo Shares held by Gingerpath, as well as the remaining option rights to buy 250,000 Alevo Shares from Alevo at a price of CHF 80 per share and 650,000 warrants to subscribe Alevo Shares at a price of CHF 120 per share shall continue to be held by Gingerpath. They shall be transferred to JE, as the case may be, under the conditions and in accordance with Sections 4 and 5 below.

- 5 -

3.7     JE shall have the right to issue binding voting instructions to Gingerpath essentially in the form attached hereto as <u>Appendix D</u>, by which he may order Gingerpath how to exercise the voting rights related to the 4,366,666 Alevo Shares at shareholders' meetings of Alevo. This right shall apply to any of the 4,366,666 Alevo Shares as long as they have not been transferred to JE and have not yet been definitely forfeited to Gingerpath, in accordance with the provisions of this Agreement, after which the right shall terminate for the relevant Alevo Shares.

3.8     Gingerpath hereby undertakes to accept any such voting instructions issued by JE essentially in the form attached hereto as <u>Appendix D</u>, which are signed personally by JE and which shall have been received by Gingerpath at least 2 business days prior to the relevant shareholders meeting of Alevo, and to exercise the voting rights related to such Alevo Shares in accordance with the instructions; provided that such instructions are in line with the provisions of the present Agreement and to the extent legally permitted.

## 4     FUNDING OF ALEVO

### A.     2017 FUNDING AND MILESTONES

4.1     In order to ensure the survival of Alevo for the next years, JE and Abalith hereby undertake together to raise direct funding of Alevo through investments in the total amount of at least CHF 200,000,000 (two hundred million Swiss Francs) until September 15, 2017. JE undertakes to raise direct funding of Alevo through investments in the total amount of at least CHF 100,000,000 (one hundred million Swiss Francs) out of the total required amount of CHF 200,000,000 until September 15, 2017 (the "**2017 Funding**").

4.2     The 2017 Funding (as further defined in Section 4.3 below) shall be achieved according to the following milestone plan:

      4.2.1     a first CHF 25,000,000 (twenty-five million Swiss Francs) shall have been raised by JE by March 31, 2017 ("**Milestone 1**");

      4.2.2     a further CHF 25,000,000 (twenty-five million Swiss Francs) shall have been raised by JE by June 30, 2017 ("**Milestone 2**");

      4.2.3     a final CHF 50,000,000 (fifty million Swiss Francs) shall have been raised by JE by September 15, 2017 ("**Milestone 3**", together with Milestone 1, and Milestone 2, the "**Milestones**" and each a "**Milestone**").

4.3     The 2017 Funding shall exclusively consist in subscription by investors for Alevo Shares at a price no lower than CHF 28 (twenty-eight Swiss Francs) per share. Any other funding shall not count as 2017 Funding. Moreover, any funds raised with parties affiliated with Abalith or introduced to Alevo or JE by Abalith or the latter's affiliates shall not count as 2017 Funding. Conversely, funds raised by JE with existing shareholders of Alevo count as 2017 Funding. Moreover, the valid assignment of subscription rights by Abalith to a third-party investor, introduced by JE, shall count as 2017 Funding.

4.4     Each Milestone shall be achieved if, by the relevant date, investors have signed a valid irrevocable engagement to subscribe (subscription bulletin) for Alevo Shares and to transfer the relevant investment amount (in accordance with sub-sections 4.2.1 to 4.2.3 above) in immediately



- 6 -

available funds to a deposit bank account opened for a corresponding capital increase of Alevo. The funding shall be in cash only; any payments in kind, compensation or similar shall not count as 2017 Funding.

4.5   The achievement of the Milestones shall be independent from each other. Milestone 2, and/or Milestone 3 may still be achieved, even if Milestone 1 and/or Milestone 2 have not been achieved, it being understood, however, that if a Milestone was not achieved, the Alevo Shares to be distributed to JE under such Milestone are effectively forfeited to Gingerpath and may not be transferred to JE, even if the relevant amount has been raised at a later date.

4.6   Abalith undertakes to raise at least CHF 100,000,000 (one hundred million Swiss Francs) out of the total required amount of CHF 200,000,000. In case JE fails to raise the full CHF 100'000'000 as described in sections 4.2 − 4.5, Abalith will seek to raise the missing amounts.

**B.   TRANSFER OF ALEVO SHARES AND RIGHTS TO JE**

4.7   On condition that the 2017 Funding will be achieved, Gingerpath shall transfer all or a portion of the 4,366,666 Alevo Shares still held by it to JE, in accordance with Sections 4.10 and 4.11 and subject to Section 5.5 below, free of any liens encumbrances or rights of third-parties, with all rights attached thereto.

4.8   To that effect, Gingerpath shall sign and deliver to JE a written assignment declaration, essentially in the form of Appendix A. Each Party shall ensure that the board of directors of Alevo shall arrange for JE to be validly registered in the share register of Alevo as the shareholder of the relevant Alevo Shares, where necessary.

4.9   Moreover, simultaneously with the transfer of any Alevo Shares to JE in accordance with Sections 4.10 and 4.11 and subject to Section 5.5 below, Gingerpath shall transfer the remaining option rights to buy 250,000 Alevo Shares from Alevo at a price of CHF 80 per share and 650,000 warrants to subscribe Alevo Shares at a price of CHF 120 per share to JE, free of any liens encumbrances or rights of third-parties, with all rights attached thereto.

4.10  Any transfer of Alevo Shares and of option rights or warrants to JE shall take place not earlier than 10 working days after the Loan (as defined in Section 5.1) and any interests accrued thereon have been reimbursed to Abalith in full and without any default occurring in the interim (the **"Transfer Date"**), and provided that any of the Milestones (as defined in Section 4.2) have been achieved.

4.11  Subject to Section 5.5 below, the transfer of any Alevo Shares from Gingerpath to JE shall only occur if and to the extent one or several Milestones have been achieved, in accordance with the following conditions:

4.11.1   if Milestone 1 is achieved by March 31, 2017, JE shall be entitled to receive a first tranche of 1,091,667 Alevo Shares to be transferred to JE on the Transfer Date, subject to Section 5.5 below;

4.11.2   if Milestone 2 is achieved by June 30, 2017, JE shall be entitled to receive a second tranche of 1,091,667 Alevo Shares to be transferred to JE on the Transfer Date, subject to Section 5.5 below;

  

- 7 -

4.11.3    if Milestone 3 is achieved by September 15, 2017, JE shall be entitled to receive a third tranche of 2,183,332 Alevo Shares to be transferred to JE on the Transfer Date, subject to Section 5.5 below.

4.12    Each Party shall bear its own costs and taxes related to the transfer of the Alevo Shares, option rights and warrants by Gingerpath to JE as described in this Section.

## 5    PERSONAL LOAN GRANTED TO JE

### A.    TERMS AND CONDITIONS OF LOAN

5.1    Abalith hereby grants to JE a loan in the total amount of USD 10,000,000 (ten million US dollars) to be reimbursed in full by July 1st, 2018 (the "**Loan**").

5.2    The Loan shall carry interest of 3.5% per annum, accrued and payable quarterly, starting from April 1st, 2017.

5.3    The Loan shall be disbursed by Abalith to JE in three tranches by wire transfer to a bank account, as indicated in advance by JE to Abalith, in immediately available funds:

5.3.1    a first tranche of USD 5,000,000 (five million US dollars) shall be disbursed to JE as soon as the conditions of Section 5.4 shall have been met;

5.3.2    a second tranche of USD 2,500,000 (two million five hundred thousand US dollars) shall be disbursed to JE on March 1st 2017 at the earliest but no later than March 31st 2017; and

5.3.3    a third tranche of USD 2,500,000 (two million five hundred thousand US dollars) shall be disbursed to JE on June 1st, 2017, at the earliest and no later than July 31st, 2017, on condition that Milestone 1 has been achieved by that date.

5.4    The first tranche of the Loan shall be granted on condition that:

5.4.1    the Shareholders' Agreement will have been validly terminated, in accordance with Section 1 above;

5.4.2    all 4,366,666 Gingerpath Shares held by JE will have been validly transferred to Abalith and Abalith has been validly registered in the share register of Gingerpath as the sole shareholder of Gingerpath, in accordance with Section 2 above;

5.4.3    all 3,219,206 Alevo Shares will have been validly transferred to Ábalith and JE will not have voted (through his voting rights in Alevo held directly or indirectly) in a way to prevent such transfer;

5.4.4    the board of directors of Alevo will have appointed a new CEO in accordance with Section 6 below.

### B.    SECURITY OF REIMBURSEMENT OF LOAN

5.5    The full reimbursement of the Loan and of the accrued interests by July 1st, 2018, in accordance with Sections 5.1 and 5.2 above, shall be a condition to any transfer of Alevo Shares, option rights



- 8 -

or warrants held by Gingerpath to JE, in accordance with Sections 4.7 to 4.11 above. No Alevo Shares, option rights or warrants shall be transferred by Gingerpath to JE, if the Loan is not fully reimbursed by July 1st, 2018.

5.6     The Loan shall become immediately reimbursable, if the CEO appointed in accordance with Section 6 below (i) has been revoked and JE (through his own shares or shares held indirectly by him) has voted in favor of the revocation of the CEO without the consent of Abalith; or (ii) the CEO is not immediately replaced with a new CEO approved by Abalith, and JE (through his own shares or shares held indirectly by him) has not voted in favor of the CEO approved by Abalith. The Loan shall also become immediately reimbursable if conditions described in Section 7 are not met by JE (including but not limited to the breach of warranties and representations).

**6       APPOINTMENT OF ALEVO CEO**

6.1     The Parties hereby agree that a new chief executive officer of Alevo (the **"CEO"**) must be found. The new CEO shall be suggested by Abalith and appointed by the board of directors of Alevo, after consultation of JE. JE shall not be able to refuse a CEO suggested by Abalith.

6.2     The Parties shall ensure that the new CEO shall be appointed by the board of directors of Alevo in December 2016. The new CEO shall formally start in his function in March, 2017, or at any other such time as may be decided by the board of directors of Alevo.

6.3     If the new CEO leaves his function, he shall be immediately replaced by another CEO approved by Abalith.

**7       ASSIGNMENT AND TRANSFER OF TECHNOLOGY**

7.1     JE hereby warrants and represents that he has assigned and transferred to Alevo any intellectual property rights (including know-how, technology and other rights, the **"IP Rights"**) relevant to the business of Alevo relating to the composition and the production process of Alevolyte (Alevo's proprietary electrolyte). Moreover, JE hereby agrees to grant access to Abalith to the relevant know-how related to the business of Alevo.

7.2     JE shall perform any acts necessary to ensure that any non-patented or non-registered IP Rights, relating to the electrolyte, shall have been fully disclosed to Abalith not later than December 23, 2016.

7.3     Moreover, the Parties and Alevo shall sign separate written assignment, as may be required, make any declarations or notifications, and undertake any acts required or useful to have such non-patented and/or non-registered IP rights properly documented and securely (to avoid risk of theft or loss) held by Alevo   not later than December 23, 2016.

7.4     The Parties shall ensure that the board of directors of Alevo shall approve or ratify such disclosure and access to Abalith, if so required.

- 9 -

7.5   JE further warrants and represents that he no longer owns any intellectual property relevant to the business of Alevo that should be included in the IP Rights. JE hereby represents and warrants that all other intellectual property (registered and non-registered, including know-how, technology and other rights), used by Alevo today in research, development and industrial production of its battery cells (including but not limited to cell design and cell chemistry) is owned by Alevo.

**8      CONFIDENTIAL INFORMATION**

8.1   The Parties each undertake that they shall not, at any time hereafter, divulge or communicate to any person (other than where relevant to their officers, employees or professional advisers whose position makes it necessary to know the same) any information on Alevo's business or affairs or about the content of this Agreement (the **"Confidential Information"**) except for such information that:

  (i)    was known or used by the receiving Party or its affiliates prior to its date of disclosure to the receiving Party as demonstrated by legally admissible evidence available to the receiving Party or its affiliates;

  (ii)   either before or after the date of the disclosure to the receiving Party is lawfully disclosed to the receiving Party or its affiliates by sources other than the disclosing Party rightfully in possession of the Confidential Information;

  (iii)  either before or after the date of the disclosure to the receiving Party becomes published or otherwise part of the public domain through no fault or omission on the part of the receiving Party or its affiliates;

  (iv)   is independently developed by or for the receiving Party or its affiliates without reference to or in reliance upon the Confidential Information as demonstrated by competent written records; or

  (v)    is required to be disclosed by the receiving Party to comply with applicable laws or regulations or to defend or prosecute litigation, provided that the receiving Party provides prior written notice of such disclosure to the disclosing Party and takes reasonable and lawful actions to avoid or minimize the degree of such disclosure.

**9      AMENDMENTS**

9.1   None of the terms or provisions of this Agreement may be amended, supplemented or otherwise modified except by a written instrument executed by the Parties.

**10     NOTICES**

10.1  Any notice or other communication given or made under or in connection with the matters contemplated by this Agreement shall be delivered or sent by registered mail to the relevant Party



- 10 -

to be served at the address appearing on the front page of this Agreement or such other address as each Party may communicate for that purpose from time to time.

10.2   Any communication by registered mail shall be considered received within seven days after the post stamp of its expedition.

## 11   ENTIRE AGREEMENT

11.1   This Agreement together with its appendices constitute the whole and only agreement between the Parties relating to its subject matter and supersedes and extinguishes any prior agreements, undertakings and arrangements of any nature whatsoever whether or not in writing relating thereto.

## 12   SEVERABILITY

12.1   If any provision or any portion of any provision contained in the Agreement is invalid, illegal or unenforceable, the remaining provisions, and if a portion of any provision is unenforceable, the remaining portion of such provision shall, nevertheless, remain in full force and effect. The Parties undertake to negotiate in good faith with a view to replace such invalid, illegal or unenforceable provision or part thereof with another provision not so invalid, illegal or unenforceable with the same or similar effect.

## 13   NO WAIVER

13.1   The failure by any Party to this Agreement to enforce at any time or for any period of time any provision of this Agreement shall not be construed as a waiver of such provision or of the right of such Party thereafter to enforce each and every such provision of this Agreement.

## 14   ASSIGNMENT

14.1   Except as specifically provided in this Agreement, any rights, obligations or liabilities hereunder shall not at any time be assigned by any of the Parties without the prior written consent of the other Party.

## 15   EXPENSES

15.1   Except as specifically provided otherwise in this Agreement, each Party shall bear its own costs and taxes incurred in connection with the negotiation of this Agreement, including without limitation, costs related to the fees for financial and legal advisors.

## 16   GOVERNING LAW

16.1   This Agreement is subject to, shall be construed in accordance with and governed by the laws of Switzerland.

- 11 -

## 17 ARBITRATION

17.1 Any dispute, controversy or claim arising out of or in relation to this Agreement, including the validity, invalidity, breach or termination thereof, shall be settled by arbitration in accordance with the Swiss Rules of International Arbitration of the Swiss Chambers of Commerce in force on the date when the Notice of Arbitration is submitted in accordance with these Rules. The number of arbitrators shall be one. The seat of the arbitration shall be in Geneva. The arbitral proceedings shall be conducted in English.

*(signature page follows)*

- 12 -

IN WITNESS WHEREOF, this Agreement has been signed by duly authorized representatives of the Parties as of the day and year first above written.

Mr. Jostein Eikeland:

ABALITH HOLDINGS LIMITED:

By: _____
Name: Iliana Ch. Giannakou

By: _____
Name: Audrulla Papadopulo

GINGERPATH LIMITED:

By: _____
Name: Iliana Ch. Giannakou

By: _____
Name: Audrulla Papadopulo

- 13 -

**Appendix A**

**Instrument of Transfer of Shares**

## Instrument of Transfer

I, Mr. Jostein EIKELAND, of Zumettas 13, 1936 Verbier, Switzerland (hereinafter called the **"transferor"**) for good and valuable consideration paid to me by ABALITH HOLDINGS LIMITED of Arch. Makariou III avenue, 195, Neocleous House, 3030 Limassol, Cyprus (hereinafter called the **"transferee"**) do hereby transfer to the said transferee the shares shown in the schedule below held by us in the undertaking called

### GINGERPATH LIMITED (the "Company")
Arch. Makariou III, 195, Neocleous House, 3030 Limassol, Cyprus

To hold unto the said transferee, transferee's executors, administrators and assigns subject to the several conditions on which we held the same at the time of the execution thereof. And the said transferee does hereby agree to take the said shares subject to the conditions aforesaid.

### Schedule

| | | | | |
|---|---|---|---|---|
| No. of shares | -4.366.666- (four million three hundred sixty-six thousand six hundred sixty-six) | | | |
| Serial No. of shares | **From** | 1,851,801 7,006,251 | **to** | 6,051,800 and 7,172,916 |
| Nominal value of each share | CHF0.001 | | | |

Signature of
The transferor

Date: 05.12.2016

Signature of
The transferee

Date: 05.12.2016

Witness to the signature of transferor

Witness to the signature of transferee

- 14 -

**Appendix B**

**Gingerpath Board and Shareholders' Resolutions**

**GINGERPATH LIMITED ("the Company")**
**Registration No. HE 351930**

---

**WRITTEN RESOLUTIONS OF THE DIRECTORS OF THE COMPANY PASSED PURSUANT TO THE ARTICLES OF ASSOCIATION OF THE COMPANY DATED 5 DECEMBER 2016**

---

**(A) IT BEING NOTED THAT:**

(1)  The Company is a shareholder in ALEVO GROUP SA, a corporation organized under the laws of Switzerland and registered with the Commercial Register of Bas-Valais under number CHE-482.059.639, (the "**Alevo**");

(2)  The Company currently holds 7,585,872 Shares in Alevo (the "**Alevo Shares**"), option rights to buy 500,000 Alevo Shares from Alevo at a price of CHF 80 per share, and 1,300,000 warrants to subscribe Alevo Shares at a price of CHF 120 per share.

(3)  On February 29, 2016, Mr. Jostein EIKELAND ("**JE**") and ABALITH HOLDINGS LIMITED, ("**Abalith**") have entered into a shareholders' agreement governing their relationship as shareholders of the Company (the "**Shareholders' Agreement**"). The shareholding of JE in the Company is 4.366.666 ordinary shares of CHF0.001 each (the "**Gingerpath Shares**") representing 57.56% of the issued share capital and Abalith holds 3.219.206 shares representing 42.44% of the issued share capital.

(4) JE and Abalith now wish to reorganize their mutual relationship with a view to refinance Alevo and to ensure its survival for the next years. To that effect (a) the Shareholders' Agreement shall be terminated; (b) the Gingerpath Shares held by JE shall be transferred to Abalith; (c) the 3,219,206 Alevo Shares held by the Company shall be distributed to Abalith; (d) the remaining 4,366,666 Alevo Shares held by the Company shall remain with the Company to be later distributed to JE on certain conditions; (e) the Company shall transfer to Abalith (i) option rights to buy 250,000 Alevo Shares from Alevo at a price of CHF 80 per share, and (ii) 650,000 warrants to subscribe Alevo Shares at a price of CHF 120 per share; (f) a plan for a new funding of Alevo shall be set up; (g) Abalith shall grant a personal loan to JE; and (h) the staffing of the function of the CEO of Alevo shall be regulated.

(5)  Pursuant to the above the Company, JE and Abalith intend to enter into a Reorganisation Agreement draft of which has been forwarded to the Board for review and approval.

(6)  JE and Abalith pursuant to the Reorganisation Agreement shall sign an Instrument of Transfer ("**IoT**") for the Gingerpath Shares which has been forwarded to the attention of the Directors for consideration and approval.

(7)  The Reorganisation Agreement and the IoT , as well as any ancillary documents will be referred to as the "Transaction Documents" herein.

(8)  The Directors of the Company have reviewed the written resolutions of the shareholders of the Company dated [...] December 2016 which have been passed according to the Articles of Association of the Company and whereby the following shareholder resolutions were, among others, resolved that:



1

(a) the Shareholders' Agreement shall be terminated with effect as of 5 December 2016;

(b) the Gingerpath Shares held by JE shall be transferred to Abalith, pursuant to an IoT;

(c) the 3,219,206 Alevo Shares held by the Company shall be distributed to Abalith;

(d) the remaining 4,366,666 Alevo Shares held by the Company shall remain with the Company to be later distributed to JE on certain conditions;

(e) the Company shall transfer to Abalith (i) option rights to buy 250,000 Alevo Shares from Alevo at a price of CHF 80 per share, and (ii) 650,000 warrants to subscribe Alevo Shares at a price of CHF 120 per share; (f) a plan for a new funding of Alevo shall be set up; (g) Abalith shall grant a personal loan to JE; and (h) the staffing of the function of the CEO of Alevo shall be regulated.

(f) a plan for a new funding of Alevo shall be set up;

(g) Abalith shall grant a personal loan to JE;

(h) the staffing of the function of the CEO of Alevo shall be regulated; and

(j) the entering of the Company into the Reorganisation Agreement is approved.

## (B) DIRECTORS' INTERESTS:

The Directors declared pursuant to Section 191, of the Companies Law, Cap 113 of Laws of Cyprus, as amended, that they have no personal interest in the subject matter of the Resolutions.

## (C) DIRECTORS ACKNOWLEDGEMENT:

THE DIRECTORS of the Company, by placing their signatures hereto, acknowledge that they have received, reviewed and considered the Transaction Documents and all matters set out above including inter alia matters effected by the ordinary resolutions of the shareholders of the Company dated on or about the date of these resolutions.

## (D)   BY TAKING NOTE OF THE SHAREHOLDERS' RESOLUTIONS, IT IS HEREBY UNANIMOUSLY RESOLVED THAT:

(1)     the entering of the Company into the Reorganisation Agreement is to the best interest and commercial benefit of the Company and therefore is hereby approved. The execution of the Reorganisation Agreement by any of the directors of the Company is hereby approved and confirmed.

(2)     the Shareholders' Agreement is terminated with effect as of 5 December 2016;

(3)     the Gingerpath Shares held by JE be transferred to Abalith, pursuant to an IoT, attached hereby as Appendix "A" with effect as of 5 December 2016;

(4)     the 3,219,206 Alevo Shares held by the Company be distributed to Abalith with effect as of 5 December 2016;

(5)     the remaining 4,366,666 Alevo Shares held by the Company shall remain with the Company to be later distributed to JE on certain conditions;

(6)  the Company shall transfer to Abalith (i) option rights to buy 250,000 Alevo Shares from Alevo at a price of CHF 80 per share, and (ii) 650,000 warrants to subscribe Alevo Shares at a price of CHF 120 per share;

(7)     a plan for a new funding of Alevo shall be set up;

(8)     the staffing of the function of the CEO of Alevo shall be regulated;

2

PLTS_Ex. "A" -- 49

(9)    Any of the directors of the Company be and is hereby authorised to attend to all such acts and things as may be necessary or desirable under applicable law in order to give effect to the above Resolutions;

(10)    The Company Secretary be and is hereby instructed to attend to all matters relating to the transfer of shares in the Company including inter alia the cancellation of the current share certificates no. 7 and 12, and the issuance of a new share certificate no.14; and

(11)    The final shareholding structure of the Company upon the annotation of the Company's records will be as follows:

ABALITH  HOLDINGS LIMITED 7.585.872 ordinary shares of  CHF0.001 each


IT IS FURTHER UNANIMOUSLY RESOLVED that these resolutions may be executed in one or more counterparts, and by facsimile and/or electronic mail, each of which shall be an original and all of which when taken together shall constitute one instrument between the parties hereto.


ANDROULLA  PAPADOPOULOU                     ILIANA CHATZISAVVA GIANNAKOU

3

**GINGERPATH LIMITED ("the Company")**
**Registration No. HE 351930**

---

**WRITTEN RESOLUTIONS OF THE SHAREHOLDERS OF THE COMPANY PASSED PURSUANT TO THE ARTICLES OF ASSOCIATION OF THE COMPANY ON 5ᵗʰ DECEMBER 2016**

---

### (A) IT BEING NOTED THAT:

(1) The Company is a shareholder in ALEVO GROUP SA, a corporation organized under the laws of Switzerland and registered with the Commercial Register of Bas-Valais under number CHE-482.059.639, (the "**Alevo**");

(2) The Company currently holds 7,585,872 Shares in Alevo (the "**Alevo Shares**"), option rights to buy 500,000 Alevo Shares from Alevo at a price of CHF 80 per share, and 1,300,000 warrants to subscribe Alevo Shares at a price of CHF 120 per share.

(3) On February 19, 2016, the shareholders of the Company namely Mr. Jostein EIKELAND ("**JE**") and ABALITH HOLDINGS LIMITED, ("**Abalith**") have entered into a shareholders' agreement governing their relationship as shareholders of the Company (the "**Shareholders' Agreement**"). The shareholding of JE in the Company is 4.366.666 ordinary shares of CHF0.001 each (the "**Gingerpath Shares**") representing 57.56% of the issued share capital and Abalith holds 3.219.206 shares representing 42.44% of the issued share capital.

(4) JE and Abalith now wish to reorganize their mutual relationship with a view to refinance Alevo and to ensure its survival for the next years. To that effect (a) the Shareholders' Agreement shall be terminated; (b) the Gingerpath Shares held by JE shall be transferred to Abalith; (c) 3,219,206 Alevo Shares held by the Company shall be distributed to Abalith; (d) the remaining 4,366,666 Alevo Shares held by the Company shall remain with the Company or will be later distributed to JE if certain conditions are met; (e) the Company shall transfer to Abalith (i) option rights to buy 250,000 Alevo Shares from Alevo at a price of CHF 80 per share and (ii) 650,000 warrants to subscribe Alevo Shares at a price of CHF 120 per share. The remaining option rights to buy 250,000 Alevo Shares from Alevo at a price of CHF 80 per share and 650,000 warrants to subscribe Alevo Shares at a price of CHF 120 per share shall continue to be held by the Company or will be later distributed to JE if certain conditions are met; (f) a plan for a new funding of Alevo shall be set up; (g) Abalith shall grant a personal loan to JE; and (h) the staffing of the function of the CEO of Alevo shall be regulated.

(5) Pursuant to the above the Company, JE and Abalith intend to enter into a Reorganisation Agreement draft of which is hereby attached as Appendix "A".

(6) JE and Abalith pursuant to the Reorganisation Agreement shall sign an Instrument of Transfer ("**IoT**") for the Gingerpath Shares in an agreed form attached as Appendix "B".

(7) The Reorganisation Agreement and the IoT , as well as any ancillary documents will be referred to as the "Transaction Documents" herein.

1

PLTS_Ex. "A" -- 51

**(B) IN LIGHT OF THE ABOVE IT IS HEREBY UNANIMOUSLY RESOLVED THAT:**

a.   the entering of the Company into the Reorganisation Agreement is hereby approved and confirmed.

b.   the Shareholders' Agreement is terminated with effect as of 5th December 2016;

c.   the transfer of the Gingerpath Shares held by JE to Abalith, pursuant to an IoT, attached hereby as Exhibit "a" is approved;

d.   the distribution of 3,219,206 Alevo Shares held by the Company to Abalith be approved;

e.   the remaining 4,366,666 Alevo Shares held by the Company shall remain with the Company or will be later distributed to JE if certain conditions are met;

f.   the transfer by the Company to Abalith of (i) the option rights to buy 250,000 Alevo Shares from Alevo at a price of CHF 80 per share, and (ii) 650,000 warrants to subscribe Alevo Shares at a price of CHF 120 per share, for a fair market value consideration is approved; the remaining option rights to buy 250,000 Alevo Shares from Alevo at a price of CHF 80 per share and 650,000 warrants to subscribe Alevo Shares at a price of CHF 120 per share shall continue to be held by the Company or will be later distributed to JE if certain conditions are met;

g.   the set-up of a plan for a new funding of Alevo is approved;

h.   the staffing of the function of the CEO of Alevo shall be regulated;

i.   The directors of the Company be and is hereby authorised to attend to all such acts and things as may be necessary or desirable under applicable law in order to give effect to the above Resolutions;

IT IS FURTHER UNANIMOUSLY RESOLVED that these resolutions may be executed in one or more counterparts, and by facsimile and/or electronic mail, each of which shall be an original and all of which when taken together shall constitute one instrument between the parties hereto.

Mr. Jostein EIKELAND                         ABALITH HOLDINGS LIMITED

2

- 15 -

Appendix C

## Assignment Declaration

(*Déclaration de cession / Abtretungserklärung*)

by

GINGERPATH LIMITED

regarding

3,219,206 registered shares in

ALEVO GROUP SA, in Martigny, Switzerland (CHE-482.059.639) (the "Company")

We, GINGERPATH LIMITED with registered offices at Arch. Makariou III, 195, Neocleous House, 3030 Limassol, Cyprus and registered with the Cyprus Registrar of Companies under registration no. HE 351930, hereby validly assign 3,219,206 (three million two hundred nineteen thousand two hundred and six) ordinary registered shares with a nominal value of CHF 0.01 each in the Company (the **"Shares"**) and all rights and obligations attaching thereto to ABALITH HOLDINGS LIMITED, with registered offices at Arch. Makariou III, 195, Neocleous House, 3030 Limassol, Cyprus and registered with the Cyprus Registrar of Companies under registration no. HE 270175, and declare that we shall no longer be regarded by the Company as holders of the Shares.

**For GINGERPATH LIMITED:**

Place and Date:

Name: Iliana Ch. Giannaku

Function: Director

Name: Andronilla Papadopoulou

Function: Director

**ABALITH HOLDINGS LIMITED hereby accepts this assignment.**

Place and Date:

Name: Iliana Ch. Giannaku

Function: Director

Name: Andronilla Papadopoulou

Function: Director.

- 16 -

**Form of Voting Instructions**

**To:**  **GINGERPATH LIMITED**
Arch, Makariou III, 195, Neocleous House, 3030 Limassol, Cyprus

**From:**  Jostein EIKELAND
Zumettas 13, 1936 Verbier195, Switzerland

[Place], [Date]

**Re:**  **Voting Instructions Regarding the Shareholders' Meeting of ALEVO GROUP SA, in Martigny, of [Date]**

Dear Sirs,
I refer to the reorganization agreement dated December 5, 2016, by and among Abalith Holdings Limited, Gingerpath Limited, and myself (the "**Agreement**") regarding the Reorganization of ALEVO GROUP SA (the "**Company**"), as well as to the upcoming shareholders' meeting of the Company to be held in [Place] on [Date], as specified in the invitation to such shareholders' meeting dated [Date]. Unless otherwise specified herein, capitalized terms herein shall have the meaning ascribed to them in the Agreement.

In accordance with Sections 3.7 and 3.8 of the Agreement, I hereby validly and irrevocably instruct you to exercise the voting rights related to the [4,366,666] Alevo Shares or any other such maximum number of Alevo Shares, which have not yet been transferred to me and which have not yet been definitely forfeited to you, in accordance with the provisions of the Agreement as follows:

|  | *Voting Instructions* | *Yes* | *No* | *Abst* |
|---|---|---|---|---|
| 1 | [Item 1] | ☐ | ☐ | ☐ |
| 2 | [Item 2] | ☐ | ☐ | ☐ |
| 3 | [Item 3] | ☐ | ☐ | ☐ |

Yours faithfully,

Jostein EIKELAND